**UNITED STATES of America, Appellee,**

v.

**GAF CORPORATION, GAF Chemicals Corporation, Jay & Company, Inc., James T. Sherwin, Defendants,**

**GAF Corporation, James T. Sherwin, Appellants.**

**Nos. 444, 445, Dockets 90–1352, 90–1353.**

United States Court of Appeals, Second Circuit.

Argued Nov. 26, 1990.

Decided March 18, 1991.

Arthur L. Liman, Paul, Weiss, Rifkind, Wharton & Garrison (Max Gitter, John N. Gevertz, Laura Farina, Paul, Weiss, Rifkind, Wharton & Garrison, of counsel), and David E. Nachman, New York City, for defendant-appellant GAF Corp.

Stephen E. Kaufman, P.C., and Kronish, Lieb, Weiner & Hellman, New York City (Alan Levine, William J. Schwartz, Cindi R. Brandt, Kronish, Lieb, Weiner & Hellman, of counsel) for defendant-appellant James T. Sherwin.

Roger S. Hayes, Acting U.S. Atty., S.D. N.Y. (Carl H. Lowenson, Jr., Kevin R. Czinger, Daniel Richman, Asst. U.S. Attys., New York City, of counsel), for appellee.

Before ALTIMARI and MAHONEY, Circuit Judges, and DALY, District Judge.[1]

DALY, District Judge.

## INTRODUCTION

Three trials have been started in this matter. The verdicts here appealed came at the conclusion of the third trial, which began November 13, 1989, and lasted five weeks before Judge Lowe and a jury. Although appellants have presented various issues for our consideration in their consolidated appeal, our primary concerns relate to the effect of the government's amendment of its bill of particulars, the trial court's ruling on the defendants' request that the original bill be admitted into evidence for comparison, the government's rebuttal summation concerning the subject of the amendment, and the trial court's ruling on the defendants' request for an instruction concerning the chief defense theory, which was integrally related to the amendment and the government's rebuttal summation.

GAF and Sherwin appeal from judgments convicting them of conspiring to violate the federal securities and anti-fraud laws, in violation of 18 U.S.C. § 371, price manipulation of the common stock of Union Carbide Corporation from October 1, 1986 through November 10, 1986, in violation of 15 U.S.C. §§ 78i(a)(2), 78ff, and 18 U.S.C. § 2, securities fraud for the manipulative purchases of Union Carbide stock on October 29, 1986, and October 30, 1986, in viola-

tion of 15 U.S.C. §§ 78j(b), 78ff, 17 C.F.R. § 240.10b–5, and 18 U.S.C. § 2, wire fraud, in violation of 18 U.S.C. §§ 1343, 2, and aiding and abetting the making and maintaining of false books and records by a securities broker-dealer, in violation of 15 U.S.C. §§ 78q(a), 78ff, 17 C.F.R. §§ 240.-17a–3, 240.17a–4, and 18 U.S.C. § 2. The court sentenced Sherwin to concurrent six-month terms of imprisonment to be followed by concurrent one-year terms of probation. The court also imposed a mandatory $50 special assessment on each count of which he was convicted, for a total assessment of $400. GAF was fined $250,000 on each each count, for a total fine of $2 million, and the court also imposed a $50 special assessment on each count, for a total assessment of $400.

The defendants' chief contention at both the second and third trials was that evidence indicated that Boyd Jefferies, the founder of Jefferies & Company, rather than Sherwin, was responsible for unlawful trades taking place in November, 1986, that the government believed originally that these trades were linked to the trades for which Sherwin was ultimately convicted, and so noted in its original bill of particulars, and that since there was reasonable doubt concerning who was responsible for the November trades, there must be reasonable doubt concerning who was responsible for the trades which were the subject of the third trial.

We hold that the unusual history and circumstances of this case required that the court admit into evidence the original bill of particulars for the jury's comparison, and that the court give an instruction similar to that requested concerning the defendants' theory of the case. Because the court refused to admit the original bill into evidence, and refused to give the requested instruction, we believe that the chief defense theory was not fairly presented to the jury. Accordingly, as discussed below, we reverse the judgments of convic-

---

**1.** The Honorable T.F. Gilroy Daly, United States District Judge for the District of Connecticut, sitting by designation.

tion and remand this case to the district court for a new trial.

## DISCUSSION

### 1. FACTS

After an unsuccessful tender offer for Union Carbide in December 1985, GAF held nearly 10% of Union Carbide's common stock, or approximately 10 million shares. Shortly after October 2, 1986, GAF decided to solicit bids for the possible sale of some or all of its Union Carbide block, and assigned Sherwin, GAF's Vice-Chairman, to oversee this process. Sherwin solicited bids from the then-leading block traders in the nation, including Jefferies & Company. The block bids which GAF received were generally a fraction of a point lower than publicly-quoted market prices.

The government's evidence indicated that the market price for Union Carbide stock had declined from a high of $25½ per share in April 1986 to a low of $20 per share on October 7, 1986. Although the price of Union Carbide began a recovery in mid-October, on October 28, 1986, it closed at a price ($21⅞ per share) lower than the day before for the first time since October 7, 1986. That same day, market information indicated a large supply of Union Carbide stock available for sale below $22.

According to Boyd Jefferies, who testified for the government, GAF's Chairman Samuel Heyman called him in mid-October to tell him to expect a call from Sherwin. Jefferies testified that Sherwin called later that day to inquire whether Jefferies, if so asked, could make Union Carbide stock close at a particular price or higher for several days in a row. Jefferies testified that he replied affirmatively, and that Sherwin assured him that GAF would guarantee Jefferies against any loss. Jefferies testified that he then informed James Melton, Jefferies & Company's chief trader, of the substance of this conversation, and that Melton should do whatever Sherwin asked if Sherwin called while he was out of the office.

Jefferies further testified that on October 29, 1986, Sherwin called him, indicated that he wanted to proceed with their plan, and asked if Jefferies could close Union Carbide at $22 or higher that day. Jefferies responded affirmatively, and then called Melton in Los Angeles, where he was based, to relay the request.

The evidence indicates that on October 29, 1986, shortly before the 4:00 p.m. close of the New York Stock Exchange, Melton called a brokerage firm in New York and placed an order to buy 140,000 shares of Union Carbide stock. In executing Melton's request, the brokerage firm first bought 50,000 shares of Union Carbide at $21⅞, exhausting the supply of shares at that price. One minute later, the broker bought 2000 shares of Union Carbide stock at $22 per share. The exchange "specialist" in Union Carbide then executed three "market on the close" orders at $22. Union Carbide closed on October 29, 1986 at $22 per share.

After the close of the New York Stock Exchange, Melton purchased 8000 shares of Union Carbide stock on the Pacific Stock Exchange at $22 per share.

On October 30, 1986, Union Carbide traded at below $22 per share until Melton again intervened. He instructed his broker to purchase 27,100 shares at $21⅞ in a series of trades from 3:34 P.M. until 3:53 p.m. Then, in the last two trades of the day in Union Carbide, Melton, through his broker, purchased 10,000 shares at $22⅛. Union Carbide stock closed on October 30, 1986 at $22⅛ per share.

Melton then purchased all of the shares on the Pacific Stock Exchange that were available at $22¼ (1500), and another 1500 shares at $22⅜.

On November 3, 1986, Melton sold a small number of Union Carbide shares at a time so as not to "oversize" the market by increasing the supply of stock too rapidly. Melton "aggressively" sold the remainder of the Union Carbide stock on November 4, 1986 at lower and lower prices as the market reacted (at first adversely) to news of a recapitalization program by Union Carbide. These trades resulted in a loss for Jefferies & Company.

On November 6 and 7, 1986, Jefferies & Company purchased 20,500 Union Carbide shares. As in October, the shares were placed in Jefferies & Company's "802" account—the "house" account. Also, as in October, the purchases were made shortly before the close of trading, and shares were purchased on both exchanges. The purchases also had the effect of slightly increasing Union Carbide's closing price—this time to just over $23 per share. Jefferies & Company sold these shares on November 10–12, 1986 without suffering a loss.

Melton, called by the government, testified that Sherwin never asked him to manipulate the price of Union Carbide stock, and that on October 29, and 30, as well as on November 3, and 4, and November 6, and 7, he acted pursuant to Jefferies' specific instructions.

Jefferies acknowledged that in his original statement to the government he had stated that he had effectuated the November 6, and 7, 1986 trades in order to "make back" the losses Jefferies & Company has sustained when it sold Union Carbide stock on November 3, and 4, 1986. At trial, however, although acknowledging that his story had changed, Jefferies testified that he personally had no responsibility for the November trades. He contended that he was told by Melton that Sherwin had asked Melton to make the November purchases. Melton denied ever receiving such a request, or making such statements.

## 2. PROCEDURAL HISTORY

Indictment 88 Cr. 415, filed on July 6, 1988, contained ten counts, all relating to the factual scenario described above.[2] Each count charged four defendants: GAF and Sherwin, as well as GAF Chemicals Corporation and Jay & Company, each a wholly owned subsidiary of GAF. The first trial began December 21, 1988. After

only a few days of testimony, the district court granted defendants' motion for a mistrial based upon late disclosure to the defense of an expert's report indicating that a portion of a document from the files of GAF had been altered with typewriter correction fluid. Defendants thereupon moved to dismiss the indictment on double jeopardy grounds and to stay a retrial pending appeal of the double jeopardy issue. The district court denied these motions. On January 12, 1989, this Court denied defendants' motion to stay further proceedings in the district court. In his capacity as Circuit Justice, Justice Thurgood Marshall denied defendants' stay application on January 25, 1989.

The second trial commenced January 31, 1989. After six weeks of testimony, jury deliberations began on March 11, 1989. Twelve days later, the jurors announced that they were deadlocked, and the court declared a second mistrial. On August 30, 1989, this Court affirmed the district court's denial of defendants' motion to dismiss the indictment on double jeopardy grounds. *United States v. GAF Corporation*, 884 F.2d 670 (2d Cir.1989).

Jury selection in the third trial began on October 24, 1989, and testimony began November 13, 1989. The trial concluded on December 13, 1989 when the jury returned guilty verdicts against defendants Sherwin and GAF on all counts, and acquitted defendants GAF Chemical and Jay & Company, Inc. Appellants' claims stem from events and rulings in connection with the third trial.

## 3. THE APPEAL

Before the first trial, in response to the defendants' request the government filed a bill of particulars on September 23, 1988. This bill detailed, among other matters, the date, number of shares, price per share, and stock exchange for each of the transac-

---

**2.** Prior to the first trial, Count Ten of the Indictment, charging the defendants with receiving unlawful margin loans in violation of 15 U.S.C. §§ 78g(f)(1), 78ff, 12 C.F.R. §§ 224.1 *et seq.*, and 18 U.S.C. § 2, was dismissed on the government's motion. At the close of the government's case at the second trial, Count Five of the Indict-

ment, charging the defendants with a post-manipulation sale of five million shares of Union Carbide stock on November 10, 1986 in violation of 15 U.S.C. §§ 78j(b), 78ff, 17 C.F.R. § 240.10b–5, and 18 U.S.C. § 2, was dismissed on the government's motion.

tions referred to in those portions of the Indictment alleging that defendants had engaged in a series of transactions on a national securities exchange by fraudulent and manipulative means. According to this bill, this series of transactions was comprised of trades in Union Carbide stock on October 29 and 30, and November 6 and 7, 1986.

At the second trial, the defense argued that if there was reasonable doubt about whether defendants—as opposed to Jefferies—were responsible for the November purchases, then there must be such doubt about whether the defendants were responsible for the October trades. The government, in rebuttal summation, argued that the November trades were not in the Indictment. In response, the defense asked for, and the court gave, an instruction stating that the "series of transactions" charged in the indictment included both the October and November trades. The court also read from the original bill of particulars. As noted, the jury was unable to reach a verdict.

On October 6, 1989, between the second and third trials, the government filed an amended bill of particulars which included only the October 29 and 30 trades in the charged series of transactions. At the third trial, during appellants' cross examination of Jefferies, they sought to introduce the government's original bill of particulars. Judge Lowe denied this offer, stating that a bill of particulars is not a pleading, and the government is not bound by it. Judge Lowe further noted that the government has absolute discretion to determine the contents of what it chooses to prove in a criminal case, as well as the absolute discretion to withdraw any proof it chooses. Finally, Judge Lowe noted that a bill of particulars is not evidence in a case, and that there is no doctrine of admissions "against the government the same as there would be against civil litigants or against defendants in a criminal case."

During the trial, portions of testimony and exhibits described the November transactions. In summation, the appellants argued that the trading patterns by Jefferies & Company in the November transactions were identical to those in October, and that since Jefferies was responsible for the November trades, he, rather than Sherwin, must also have been responsible for the October trades. Defense counsel called the November trades "the key to the puzzle...."

On rebuttal summation, the government addressed the defense contentions. The government argued "[t]he November purchases of Union Carbide stock by Jefferies & Company is another smokescreen. The defendants want you to focus on the November purchases so that you don't look at the October purchases." The government pointed out what it perceived were differences between the October and November trades, and then noted "there is another essential difference between the October purchases and the November purchases. The November purchases are not in this indictment. The October purchases are in this indictment." The government also stated that "this case is not about the November trades."

On the Monday following the government's rebuttal summation, defendants requested in writing the following curative instruction:

> In its rebuttal summation, the government argued that the defendants' references to Jefferies' November purchases of Union Carbide were a smokescreen. I instruct you that you may consider the evidence of the November purchases in reaching your conclusion as to who was responsible for the October purchases of Union Carbide.

The court denied defendants' request, responding "I deny that. I just don't even need argument on that."

### (a) The Bill of Particulars

■ Appellants assign as error Judge Lowe's denial of defendants' motion to introduce the Government's original bill of particulars into evidence when cross-examination of Jefferies began. Appellants urge that the original bill, which included the November transactions as unlawful conduct attributable to Sherwin and GAF, con-

stitutes an admission of a party-opponent under Federal Rule of Evidence 801(d)(2), and should have been admitted for the jury's consideration. Specifically, appellants contend that the government's original version of the events, which linked the October and November trades, had been discredited at the second trial and the government, therefore, deliberately adopted fundamental changes in its version of the facts in order to enhance its chances of success.

Federal Rule of Evidence 801(d)(2) provides, in relevant part, that a statement is not hearsay if "the statement is offered against a party and is (A) the party's own statement, in either an individual or representative capacity or (B) a statement of which the party has manifested an adoption or belief in its truth,...." The typical admission that falls within the parameters of this rule is that made by an actual party to a suit, whereby he or she, or his or her agent, has commented upon a matter in issue and within that person's personal knowledge. *See generally,* CLEARY, MCCORMICK ON EVIDENCE (2d ed.) 628–643 (1972).

In *United States v. McKeon,* 738 F.2d 26 (2d Cir.1984), this Court discussed extensively when statements by counsel may be admissible against a client. *Id.* at 30. We noted that "statements made by an attorney concerning a matter within his employment may be admissible against the party retaining the attorney," *id.* (quoting *United States v. Margiotta,* 662 F.2d 131, 142 (2d Cir.1981), *cert. denied,* 461 U.S. 913, 103 S.Ct. 1891, 77 L.Ed.2d 282 (1983)), and that this proposition extends to arguments counsel make to the jury. *Id.; see also Oscanyan v. Arms Company,* 103 U.S. 261, 263, 26 L.Ed. 539 (1880). We also noted that "[a]n admission by a defense attorney in his opening statement in a criminal trial has also been held to eliminate the need for further proof on a given element of an offense." *Id.* (citing *Dick v. United States,* 40 F.2d 609, 611 (8th Cir.1930)).

In *McKeon,* the defendant's attorney argued to the jury, in his opening statement in the second trial in the matter, that the evidence would show that his client had innocently assisted packing certain crates, and that another individual was actually responsible for an alleged unlawful shipment of weapons. *McKeon,* 738 F.2d at 28. In a third trial, however, this attorney's opening statement depicted his client's role in the offense differently. *Id.* The prosecution moved to admit into evidence the contradictory portion of the defense attorney's opening statement from the second trial. *Id.* The trial judge admitted this statement as an admission of a party opponent. *Id.* at 29.

We affirmed this Ruling, noting that there was no *per se* rule against the admission of inconsistent prior opening statements. *Id.* at 31. "To hold otherwise would not only invite abuse and sharp practice but would also weaken confidence in the justice system itself by denying the function of trials as truth-seeking proceedings." *Id.* Most significantly, as support for the conclusion reached in *McKeon,* this Court noted that the law is quite clear that superseded pleadings in civil cases may constitute admissions of party opponents, admissible in the case in which they were originally filed, as well as any subsequent litigation involving that party. *Id.* (citations omitted). "A party thus cannot advance one version of the facts in its pleadings, conclude that its interests would be better served by a different version, and amend its pleadings to incorporate that version, safe in the belief that the trier of fact will never learn of the change in stories." *Id.* This Court quoted extensively from Judge Swan:

> A pleading prepared by an attorney is an admission by one presumptively authorized to speak for his principal.... When a pleading is amended or withdrawn, the superseded portion ceases to be a conclusive judicial admission; but it still remains as a statement once seriously made by an authorized agent, and as such it is competent evidence of the facts stated, though controvertible, like any other extra-judicial admission made by a party or his agent.... If the agent made the admission without adequate in-

formation, that goes to its weight, not to its admissibility. *Id.* (quoting *Kunglig Jarnvagsstyrelsen v. Dexter & Carpenter, Inc.*, 32 F.2d 195, 198 (2d Cir.), *cert. denied*, 280 U.S. 579, 50 S.Ct. 32, 74 L.Ed. 629 (1929)).

The rule that inconsistent prior pleadings should be made available for the jury's comparison was reaffirmed recently by this Court in *Andrews v. Metro–North*, 882 F.2d 705 (2d Cir.1989). There, we wrote that a district court's refusal to permit jurors to be informed of an amendment to a complaint, and to examine the original complaint was "a substantial abuse of discretion." *Id.* at 707 (citing *McKeon*, 738 F.2d at 31; and *Dexter & Carpenter*, 32 F.2d at 198). This Court held that the district court's rulings were in error, and that the statements in the complaints constituted admissions. *Id.*

Although the cases construing the admissibility of inconsistent pleadings spring from civil contexts, *McKeon*, which embraced the same reasoning in addressing statements of counsel, was a criminal case. Moreover, this Court has recently suggested that affidavits filed in furtherance of an application for the installation of an electronic monitor and a subsequent search may constitute admissions of a party-opponent, and be used as such against the government by a criminal defendant. *United States v. Ramirez*, 894 F.2d 565, 570 (2d Cir.1990). We there noted that "[a]n argument can be made that when the government advances a statement of its agent in a judicial proceeding to obtain a search warrant, the government has adopted the content of the statement, and a criminal defendant may introduce the statement as a party admission under Fed.R. Evid. 801(d)(2)(B)." *Id.*

Bills of particulars, of course, are not evidence in and of themselves. *United States v. Murray*, 297 F.2d 812, 819 (2d Cir.), *cert. denied*, 369 U.S. 828, 82 S.Ct. 845, 7 L.Ed.2d 794 (1962). Their purpose is to inform a defendant of charges with sufficient precision to allow preparation of a defense, to avoid unfair surprise, and to preclude double jeopardy. *See Wong Tai v. U.S.*, 273 U.S. 77, 82, 47 S.Ct. 300, 302, 71 L.Ed. 545 (1927); *U.S. v. Bortnovsky*, 820 F.2d 572, 574 (2d Cir.1987). A bill of particulars is a statement of what the government will or will not claim in its prosecution. *Murray*, 297 F.2d at 819.

■ We think that the same considerations of fairness and maintaining the integrity of the truth-seeking function of trials that led this Court to find that opening statements of counsel and prior pleadings constitute admissions also require that a prior inconsistent bill of particulars be considered an admission by the government in an appropriate situation. Although the government is not bound by what it previously has claimed its proof will show any more than a party which amends its complaint is bound by its prior claims, the jury is at least entitled to know that the government at one time believed, and stated, that its proof established something different from what it currently claims. Confidence in the justice system cannot be affirmed if any party is free, wholly without explanation, to make a fundamental change in its version of the facts between trials, and then conceal this change from the final trier of the facts. *See McKeon*, 738 F.2d at 31.

It is no answer to reply, as the government suggests, that as it reevaluates the strength or significance of its evidence, it may change the "contours" of its case before trial, and is free under Fed.R.Crim.P. 7(f) to amend its bill as justice requires. A party in a civil case may also reevaluate his view of the evidence, and amend his complaint "when justice so requires" pursuant to Fed.R.Civ.P. 15(a). And, as the cases described above have shown, it is a substantial abuse of discretion not to allow the jury to be aware that a complaint has been amended, and to examine the prior complaint. *Andrews*, 882 F.2d at 707.

The government also urges that a bill is not an authoritative adoption by the government of the facts specified therein, but rather a statement of the facts the government intends to prove at trial. Aside from the obvious similarity such a description bears to a complaint in a civil

matter, or to counsel's argument in *McKeon,* the government also twice suggests that the original bill should be treated in the same manner as an indictment which has been superseded, and not admissible as evidence of the later indictment's infirmity. Govt's brief at 24–25 (citing *Falter v. United States,* 23 F.2d 420, 425 (2d Cir.), *cert. denied,* 277 U.S. 590, 48 S.Ct. 528, 72 L.Ed. 1003 (1927)).

The government's arguments are without merit. Judge Learned Hand, in the case cited by the government, pointed out that an indictment is not a pleading of the United States. *Falter,* 23 F.2d at 425. He noted that an indictment is "the charge of a grand jury, and a grand jury is neither an officer nor an agent of the United States, but a part of the court." *Id.* "The United States neither selects nor controls [the grand jury], nor has anything to do with it, but to present to it its evidence." *Id.* A bill of particulars, on the other hand, is prepared, reviewed, and presented by an agent of the United States. Indeed, whereas the indictment in this case was signed by the foreman of the grand jury, along with the United States Attorney, and begins "[t]he Grand Jury charges: ...", the bill of particulars is signed by the Assistant United States Attorney who tried this case, and begins "[t]he Government submits...." Thus, the government's suggestion that the Court address a bill of particulars as it would an indictment is not persuasive.

Any suggestion that the bill is not an admission because it does not represent statements based upon the government's own knowledge, is also unavailing. The bill is prepared, presumably, from the government's review of the evidence. *See also McKeon,* 738 F.2d at 32 ("admissions may ... be used even though the statement ... was not based upon the personal knowledge of the speaker ...."). As Judge Swan suggested in the civil context, if the bill was prepared without careful evaluation of the evidence, that goes to the weight to be accorded the admission, not to the prior bill's admissibility. *See id.* at 31 (citation omitted).

Finally, the government's contention that the district court properly excluded the bill on relevancy grounds fails, too. The government urges that the original bill was not proof that indicated that the defendants were innocent of the October manipulations, nor that Jefferies alone controlled both the October and November deceptions. Nevertheless, in view of the government's repeated contentions in the third trial that the November trades were significantly different from the October ones, and, especially in view of the government's argument that the defense contentions concerning the November trades were a "smokescreen", evidence that the government itself once possessed the view that the October and November trades were linked is certainly relevant to the defense.

Moreover, as explained in *McKeon,* the admissions rule is distinct from normal evidentiary rules relating to relevancy. 738 F.2d at 32. "[I]t is in some respects an exception to the general proposition that probative value and reliability are the touchstone of the law of evidence where non-privileged matters are concerned ..." *Id.* Although the reasons for relaxing the relevancy requirements for admissions are not clear, "[i]n all probability, these aspects of the rule are derived vestigially from an older, rough and ready view of the adversary process which leaves each party to bear the consequences of its own acts...." *Id.* Although this Court circumscribed the use of the admissions rule in order to avoid infringing other important interests,[3] it in

---

3. Judge Winter wrote that before permitting the use of prior jury argument, the district court must be satisfied that the prior argument involves an assertion of fact clearly inconsistent with similar assertions in a subsequent trial. *McKeon,* 738 F.2d at 33. The court must, in addition, determine that the statements of counsel were such as to be the equivalent of testimonial statements by the defendant. *Id.* Finally, the district court must determine by a preponderance of the evidence that the inferences the prosecution seeks to draw from the inconsistency are fair ones, and that innocent explanations do not exist. *Id.*

Here, all of these criteria are met. The inconsistency between the first bill's claim that the November trades constituted part of the defendants' illegal activities, and the government's

no way cast any shadow on the validity of the rule. *Id.*

■ For all of these reasons, we believe the district court should have permitted the jury to examine the government's prior bill of particulars. Although the Court in no way suggests that the government should not be able to amend its bill of particulars as it sees fit, we do hold that, if the government chooses to change its strategy at successive trials, and contradict its previous theories of the case and version of the historical facts, the jury is entitled to be aware of what the government has previously claimed, and accord whatever weight it deems appropriate to such information. There is merit still in that "rough and ready" view of the adversary process which leaves parties to bear the consequences of their own acts. Whether Judge Lowe's Ruling denying the admission of the bill constitutes reversible error in itself in this case is a question we need not reach, since further events compounded the effect of this Ruling.

### (b) The Refused Instruction

This Court has repeatedly recognized a criminal defendant's right to a jury charge which reflects the defense theory. *United States v. Dove*, 916 F.2d 41, 47 (2d Cir.1990) ("[A] criminal defendant is entitled to instructions relating to his theory of defense, for which there is some foundation in the proof, no matter how tenuous that defense may appear to the trial court."); *United States v. Durham*, 825 F.2d 716, 718 (2d Cir.1987); *see e.g., United States v. Pedroza*, 750 F.2d 187, 205 (2d Cir.1984) (quoting *United States v. O'Connor*, 237 F.2d 466, 474 n. 8 (2d Cir.1956)) ("[i]t is well established that '[a] criminal defendant is entitled to have instructions presented relating to any theory of defense for which there is

any foundation in the evidence, no matter how weak or incredible that evidence may be.'"). In *Durham*, this Court noted that this rule was widely accepted throughout the Circuits. 825 F.2d at 719 (citing *United States v. Plummer*, 789 F.2d 435, 438 (6th Cir.1986); *United States v. Wellington*, 754 F.2d 1457, 1463 (9th Cir.1985), *cert. denied*, 474 U.S. 1032, 106 S.Ct. 593, 88 L.Ed.2d 573 (1986); *United States v. Hyman*, 741 F.2d 906, 912 (7th Cir.1984)).

■ In this case, appellants at all times claimed that they were not responsible for the October trades, and that evidence of their innocence could be found by looking at the November trades. They argued that since the evidence suggested that Jefferies, rather than Sherwin, was responsible for the November trades, and since the two series of trades were virtually identical, and linked, the jury should have examined the November trades in determining who was responsible for the October trades. On appeal, appellants contend that the combination of the court's exclusion of the original bill of particulars, and the government's rebuttal summation in which it labelled the appellants' contention a smokescreen and stressed that the jury should not look to the November trades since they were not included in the indictment, had the effect of indicating to the jury that consideration of the November trades was improper and inappropriate. Moreover, appellants urge that this situation should have been remedied by the instruction which they urged the court to give, *see supra* p. 12, and that the court's failure to accept the defendants' written suggestion, submitted before the court charged the jury, left the court's actual charge incomplete and unfair, in light of the entire record.

subsequent argument that the November trades are a smokescreen, not linked to the defendants' illegal activities, is clear. Although the government is its own client, a bill of particulars is presumably prepared from a review of what the evidence will show, and, therefore, the government's statements are the functional equivalent of what the testimony will be. Finally, although in *McKeon* Judge Winter suggested that a hearing should be held to determine what inferences

are sought to be drawn by introducing the admission, and whether there is an innocent explanation for the inconsistency, 738 F.2d at 33, here the inconsistency is plain, the inferences are clear, and the government itself has offered an explanation—that it no longer believes that the evidence demonstrates that the two trading periods are necessarily linked. Accordingly, none of the considerations described in *McKeon* suggest restricting the use of the earlier bill.

■ We agree. Although the trial court is not required to review or marshal the evidence for the jury and has broad discretion to decide which facts, if any, it will mention in its comments to the jury, the discretion of the court is circumscribed by the requirement that the charge be fair to both sides. *United States v. Gillilan,* 288 F.2d 796, 798 (2d Cir.), *cert. denied,* 368 U.S. 821, 82 S.Ct. 38, 7 L.Ed.2d 26 (1961). Here, the only attention which the court gave to the defendants' theory of defense was: "defendants contend that Jefferies & Company did not act as their agent since they did not request Jefferies & Company to act in their behalf, nor did they guarantee Jefferies & Company against loss, nor did they authorize Jefferies & Company to use its discretion in making the trades of October 29 and 30 for the benefit of the defendants." In another context, the court also instructed the jury that "[a]ny of the statements or acts of" Sherwin, Heyman, Jefferies and Melton, as well as the defendant corporations "may be considered ... in deciding the issues relevant to this case." While the government urges that consideration of the November trades "certainly come[s] within the meaning of this instruction", govt's mem. at 32, we believe that, given the court's prior ruling, and the government's rebuttal summation, the jury may well have believed that the November trades, and, thus, the defense theory, were excluded from their purview. The trial court should have adopted and given some instruction similar to that suggested by defendants. *See United States v. Alfonso–Perez,* 535 F.2d 1362, 1364–67 (2d Cir. 1976).

Finally, although the district court did not elaborate upon its reasons for refusing the defendants' requested instruction, it is likely that it did so based in part upon its refusal to admit the original bill of particulars. As we have already held that the bill should have been admitted, if the district court's prior ruling concerning the bill figured in its refusal to give the instruction, such refusal, coming after the government's rebuttal summation, simply compounded the effect of the district court's erroneous ruling.

For all of the reasons described above, we hold that, in order to have fairly apprised the jury that it was entitled to review the November trades, especially in view of the court's ruling concerning the original bill of particulars, and the government's rebuttal summation, the district court should have instructed the jury about the November trades as requested.[4]

## CONCLUSION

We find that the combination of these two errors—that the district court, on the facts of this case, should have admitted the original bill of particulars, and that the court should have given an instruction similar to the one requested by the defendants in light of the prosecutor's rebuttal summation—precluded the defendants from receiving fair consideration of their defense and constitutes reversible error. *See Alfonso–Perez,* 535 F.2d at 1367. For the reasons set forth above, the judgments of conviction are hereby REVERSED and the matter is REMANDED to the district court for retrial. The Court need not consider appellants' numerous other contentions which will not likely arise in exactly the same context in any new trial.

ALTIMARI, Circuit Judge, concurring:

I write separately out of concern that the breadth and scope of Judge Daly's opinion

---

4. We do not here hold that the prosecutor's rebuttal summation itself was so improper as to require reversal. It is well established that a prosecutor is ordinarily entitled to respond to the evidence, issues, and hypotheses propounded by the defense. *United States v. Marrale,* 695 F.2d 658, 667 (2d Cir.1982), *cert. denied,* 460 U.S. 1041, 103 S.Ct. 1434, 1435, 75 L.Ed.2d 793 (1983). Nevertheless, as we have stated above, in view of the prosecutor's comments that the November trades were not in the indictment, that the defendants' arguments were merely a smokescreen, and that the case was not about the November trades, all contradicting the original bill of particulars which he filed, we do hold that the Court was obliged to instruct the jury that it was entitled to consider the defendant's evidence concerning the November trades in order to dispel the strong implication raised by the prosecutor's statements that such evidence should not be reviewed.

might lead some to assume that a bill of particulars is a document that may routinely be offered and received into evidence. In my view, such a conclusion would be unwarranted.

The defendants-appellants sought to introduce the government's original bill of particulars to demonstrate the similarity of the October and November stock transactions. Judge Lowe denied the offer. On its face, this ruling was proper. Under the unique circumstances of this case, however, the district court's ruling struck at the very heart of the defense theory. Accordingly, I am in complete agreement with the conclusion that considerations of fairness as well as the truth-seeking function of trial required admission of the bill of particulars.

This conclusion should not be construed, however, as a presumption that bills of particulars are ordinarily admissible at trial. Bills of particulars are generally of minimal probative value, and will tend to confuse the issues and mislead the jury if admitted as evidence. *See* Fed.R.Evid. 403. Consequently, admission should be the exception, not the rule. Thus, while we now recognize that bills of particulars are not inadmissible *per se*, the district courts must determine whether the circumstances of a particular case are sufficiently compelling to necessitate admission. In all other respects, I agree with Judge Daly's well-reasoned opinion.

MAHONEY, Circuit Judge, dissenting:

My colleagues conclude that the district court erred (1) by excluding from evidence the government's prior bill of particulars, and (2) by refusing to instruct the jury that it could consider the November trades in deciding who was responsible for the October trades. As will appear, I consider neither ruling of the district judge to be erroneous. Nor would I find reversible error among the defendants' other contentions. Accordingly, I respectfully dissent.

I find disturbing, however, the government's concession at the oral argument of this appeal that it had made no posttrial inquiry regarding defendants' assertion

that James Melton committed perjury in his trial testimony. I will elaborate on this matter, because I believe it bears heavily on the government's obligations with respect to any fourth trial of this indictment.

A. *Admission of the Prior Bill.*

In its first bill of particulars, the government identified, as part of the "series" of fraudulent and manipulative transactions alleged in the indictment, trades in Union Carbide stock on October 29 and 30 and November 6 and 7, 1986. Prior to commencement of the third trial, however, the government filed an amended bill that eliminated reference to the November trades. At that trial, defense counsel, in the course of cross-examination of Boyd Jeffries, sought a ruling on the admissibility of the original bill:

> MR. LEVINE: We would like to offer in evidence the amended bill of particulars and the original bill of particulars, and confront Mr. Jeffries with the fact —well, we want to be able to offer the original bill and the amended bill and use them for argument in the case.
>
> THE COURT: For what purpose?
>
> MR. LEVINE: The principal purpose, your Honor, is that the bill of particulars takes a different position with respect to the purchases on the 6th and 7th than the government's only witness who tells them about the purchases.
>
> THE COURT: That may be so, but you are going to offer the bill of particulars to prove what?
>
> MR. LEVINE: To prove that it was the government's position that the purchases on the 6th and the 7th were not made at the direction of GAF and Mr. Sherwin as alleged originally in the indictment.

Counsel summarized the intended use of the bill as follows:

> The particular importance here is that the government is taking the position in this trial not to charge the defendants with the November 6th and 7th purchases, relying on the same witnesses, the same testimony, and basically the same evidence that it did in the first and the

second trial. This is a retrial. We believe we are entitled to put before the jury the argument that they believe their witnesses less, that they are vouching less for their witnesses and that testimony by amending the bill of particulars. That is the argument we would like to make.

I cannot agree with my colleagues that the district judge abused her discretion by excluding the bill. The evidentiary worth of the bill was limited to the proposition, as argued by defense counsel, that the government no longer believed it could prove that the November trades were part of the manipulative scheme charged. In my view, the fact that the government once thought it could prove beyond a reasonable doubt that the November trades were part of a larger manipulative scheme bears little relevance to the question whether Sherwin and GAF instigated conceededly manipulative trading in October. Judge Altimari correctly observes that "[b]ills of particulars are generally of minimal probative value, and will tend to confuse the issues and mislead the jury if admitted as evidence." This case is no exception. Further, as we said recently in *United States v. Scarpa,* 913 F.2d 993, 1015 (2d Cir.1990):

> [W]e recognize "the long held view of this Circuit that the trial judge is in the best position to weigh competing interests in deciding whether or not to admit certain evidence." *United States v. Sun Myung Moon,* 718 F.2d 1210, 1232 (2d Cir.1983) (citing *United States v. Birney,* 686 F.2d 102, 106 (2d Cir.1982)), *cert. denied,* 466 U.S. 971, 104 S.Ct. 2344, 80 L.Ed.2d 818 (1984). "Absent an abuse of discretion, the decision of the trial judge to admit or reject evidence will not be overturned by an appellate court." *Id.* (citing *Birney,* 686 F.2d at 106).

The majority places primary reliance upon *United States v. McKeon,* 738 F.2d 26 (2d Cir.1984). In *McKeon,* defense counsel, during the opening statement at a criminal trial, declared that expert testimony would prove that crucial documents had not been prepared on a copying machine located at the bank where the defendant's wife worked. At a retrial, however, counsel's opening statement set forth a new version of the facts, explaining that the defendant had asked his wife to prepare the copies at the bank. We held that the altered version was fairly attributable to the defendant, 738 F.2d at 33–34, and that the trial court properly admitted at the later trial the contradictory promise of proof at the prior trial as "evidence of fabrication demonstrating consciousness of guilt." *Id.* at 34.

I agree with my colleagues that, under *McKeon,* there is no *per se* rule against the admission of bills of particulars. Nonetheless, two of the three limits that *McKeon* articulated for the use of prior opening statements, *see* 738 F.2d at 33, weigh decidedly against admitting the bill in our case.

Most fundamentally, I do not see any "assertion of fact inconsistent with similar assertions in a subsequent trial," *McKeon,* 738 F.2d at 33, in this case. *McKeon* involved an assertion at the first trial that certain documents had not been prepared on a certain copying machine, and a flatly contradictory declaration at the second trial that they had been so prepared. Here, by contrast, the government simply revised its theory regarding what it could establish, in terms of a series of fraudulent or manipulative transactions, by introducing substantially the same evidence at the third trial that it had utilized at the second trial. It also seems to me that this rationale is an "innocent explanation" within the meaning of the third *McKeon* requirement, 738 F.2d at 33.

*McKeon* posited these limitations because "the evidentiary use of prior jury argument must be circumscribed in order to avoid trenching upon other important policies." *Id.* at 32. I see the same necessity regarding the evidentiary use of prior bills of particulars, and thus discern no reversible error in the district court's ruling on this issue.

## B. *The Requested Instruction.*

After the government's rebuttal summation, the defendants asked for, and were denied, an instruction that the jurors "may

consider the evidence of the November purchases in reaching [their] conclusion as to who was responsible for the October purchases of Union Carbide." This request responded to the government's characterization of the defense closing arguments premised upon the November trades as a "smokescreen."

The defense theory was that Jeffries & Company manipulated the price of Union Carbide stock on its own initiative, and for its own purposes, in both October and November. Essentially, the government argued in rebuttal that defense counsel was seeking to draw attention away from the proof of criminality in October by emphasizing the trades that Jeffries & Company engaged in the following month.

I fail to see how this argument is inappropriate or unfair. Understandably, defense counsel wanted the chance to respond, to urge once again the asserted relevance of the November trades. However, Fed.R.Crim.P. 29.1 gives the prosecution the final opportunity to argue to the jury. A defendant is not entitled to have the trial judge voice what is in effect his surrebuttal by characterizing commentary on the evidence as a "curative instruction".

The district court instructed the jury concerning defendants' contention that Jefferies & Company "did not act as their agent." As indicated above, the defense theory was that Jefferies & Co. had motives to manipulate Union Carbide stock on its own behalf, and in fact did exactly that. Perhaps the district court might have been obliged to respond affirmatively to a request that its instruction be amplified to charge *that* defense theory more precisely. No such request, however, was made. Accordingly, as I see it, no reversible error occurred in this regard. *See* Fed.R.Crim.P. 30 (objection to instruction must "stat[e] distinctly the matter to which [the] party objects and the grounds of the objection"); *Scarpa,* 913 F.2d at 1021 (in absence of proper objection, instruction reversible only for plain error); *United States v. Torres,* 901 F.2d 205, 228 (2d Cir.) (same), *cert. denied,* — U.S. —, 111 S.Ct. 273, 112 L.Ed.2d 229 (1990).

### C. *Testimony of James Melton.*

James Melton, the chief trader at Jeffries & Company, was a key witness for the prosecution. Melton testified that Boyd Jeffries instructed him to support the price of Union Carbide stock at $22.00 per share on October 29, 30 and 31. Further, Melton testified that on each of these days he placed a telephone call shortly after the close of the Pacific Stock Exchange from Jeffries & Company's Los Angeles office to Sherwin's office at GAF. There was no record of these telephone calls over Jeffries & Company's conventional phone lines, but the parties stipulated that Jeffries & Company had fifteen outbound WATS lines for long-distance calling in its Los Angeles office. These calls, Melton said, were made pursuant to Jeffries' instructions to inform Sherwin of Union Carbide's closing price and the number of shares that Melton had purchased. On one of these three days, Melton recalled, Sherwin was not available but promptly returned the call.

After the close of the government's case, the defendants were surprised to discover that the telephone company maintained toll records of calls placed on WATS lines. The defendants introduced these records, which provided no indication of the calls to Sherwin that Melton had claimed to have made. Defense counsel argued vigorously in summation that it had been proven that Melton testified falsely. On rebuttal, the government countered by arguing that Melton, testifying pursuant to a cooperation agreement, had no motive to lie. The government concluded this portion of its argument as follows: "Now, the calls from James Melton to James Sherwin do not show up on the AT & T WATS records, but there is too much evidence from too many sources for those calls not to have happened."

Conceding that they neither objected to the government's argument in this regard nor requested a curative instruction, defendants now contend that their convictions must be reversed because the government embraced demonstrably perjurious testimo-

ny. The defendants' position is not that the government deliberately elicited falsehoods, but that it should have renounced, rather than relied upon, Melton's testimony in light of the subsequently discovered telephone records.

Melton's testimony regarding the telephone calls was significant. It was the only evidence directly linking the alleged key operatives in the manipulative scheme. Indeed, Melton repeatedly testified that he recalled speaking with Sherwin only on the three days in October 1986, and that Sherwin merely replied "thank you" after Melton delivered his information.

Nevertheless, in view of the late discovery and introduction of the documentary evidence, and the framing of the issue in terms of credibility by all parties at trial, I discern no reversible error here.

I relate this history concerning Melton's testimony because I believe it relevant to further proceedings in this case on remand. Oral argument of this appeal included the following exchange concerning this matter:

JUDGE MAHONEY: Has there been any inquiry by the US attorney's office since the close of trial?

MR. LOEWENSON: Not of telephone companies. I want to be careful, but most important to be candid with the court. No inquiry has been made either of AT & T or of Pacific Bell or Jefferies.

JUDGE MAHONEY: Has any inquiry been made that would cast any light on the question whether there is an explanation for these phone calls not being in the records, other than their not having been made or there being some inexplicable errors in the records?

MR. LOEWENSON: No, your Honor. And I am not sure that further inquiry would be of assistance in determining the issues that are relevant today, namely, whether Melton deliberately committed perjury.

In view of the disposition of this appeal, the government will be faced with a very different issue that will be relevant tomorrow; whether to proceed with a fourth trial of this indictment, and what evidence it may tender in good faith at any such trial.

The government correctly explains that the late discovery and introduction of the telephone records precluded any meaningful investigation of this situation during the third trial. It did not preclude such an inquiry in the course of the appeal, and I candidly express my disappointment that the government felt no obligation to undertake one. In any event, it appears clear to me that the government is inescapably obliged to investigate fully the contradiction between Melton's testimony and the telephone records before again proffering Melton's testimony to the district court.